**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------- X
PAUL AHERN and NEXT DECADE
ENTERTAINMENT, INC.                                    :

                 Plaintiffs,                 :         Index No. 13 Civ. 1812

    -against-                                        :

DONALD THOMAS SCHOLZ                         :

                 Defendant.
---------------------------------------------------------------- X

## DEFENDANT DONALD THOMAS SCHOLZ'
## ANSWER, COUNTERCLAIMS AND JURY DEMAND

Defendant Donald Thomas Scholz ("Scholz"), through his undersigned counsel, hereby

answers the correspondingly numbered paragraphs of the Complaint of plaintiffs Paul Ahern and

Next Decade Entertainment, Inc., as follows:

## THE PARTIES

1.     Scholz is without knowledge or information sufficient to form a belief as to the

truth of the allegations set forth in this paragraph of the Complaint.

2.     Scholz is without knowledge or information sufficient to form a belief as to the

truth of the allegations set forth in this paragraph of the Complaint.

3.     Admitted.

4.     Scholz is without knowledge or information sufficient to form a belief as to the

truth of the allegations set forth in this paragraph of the Complaint.

## JURSIDICTION AND VENUE

5.     The allegations set forth in this paragraph of the Complaint state legal conclusions

to which no response is required.

6.     The allegations set forth in this paragraph of the Complaint state legal conclusions to which no response is required, although, in so answering, Scholz denies the same.

## THE FACTS

7.     Scholz admits that he was the founder and a member of the musical group professionally known as "Boston."  The remaining allegations set forth in this paragraph of the Complaint attempt to characterize a document which, in its entirety, speaks for itself.  To the extent that said allegations misstate or mischaracterize the content, substance or import of said document, or cite to the same out of context or in a misleading fashion, they are denied.

8.     Scholz admits that he composed certain compositions that appeared on two long-playing record albums recorded by the group professionally known as "Boston," and that said recordings were released to the public by Epic Records.  Scholz denies the remaining allegations set forth in this paragraph of the Complaint.

9.     Scholz admits that he is the sole author of the following musical compositions that were embodied on the album "BOSTON," which was released in 1976:  *More Than a Feeling*, *Peace of Mind*, *Fore Play*, *Long Time*, *Rock 'n Roll Band*, *Hitch a Ride* and *Something About You*.

10.     The allegations set forth in the first phrase of the sole sentence of this paragraph of the Complaint state legal conclusions to which no response is required, and, in addition, attempt to characterize documents which, in their entirety, speak for themselves.  To the extent that said allegations misstate or mischaracterize the content, substance or import of said documents, or cite to the same out of context or in a misleading fashion, they are denied.  The remaining allegations set forth in this paragraph of the Complaint also state legal conclusions to

2

which no response is required. Further answering, Scholz avers that he is without knowledge or information sufficient to form a belief as to the truth of said allegations.

11.    Admitted.

12.    The allegations set forth in the first phrase of the sole sentence of this paragraph of the Complaint state legal conclusions to which no response is required, and, in addition, attempt to characterize documents which, in their entirety, speak for themselves. To the extent that said allegations misstate or mischaracterize the content, substance or import of said documents, or cite to the same out of context or in a misleading fashion, they are denied. The remaining allegations set forth in this paragraph of the Complaint also state legal conclusions to which no response is required. Further answering, Scholz avers that he is without knowledge or information sufficient to form a belief as to the truth of said allegations.

13.    The allegations set forth in of this paragraph of the Complaint state legal conclusions to which no response is required, and, in addition, attempt to characterize a document which, in its entirety, speaks for itself. To the extent that said allegations misstate or mischaracterize the content, substance or import of said document, or cite to the same out of context or in a misleading fashion, they are denied.

14.    Scholz admits that plaintiff worked, at certain times and in certain capacities, with an individual named Charles McKenzie, and is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in this paragraph of the Complaint.

15.    The allegations set forth in this paragraph of the Complaint attempt to characterize certain documents which, in their entirety, speak for themselves. To the extent that

3

said allegations misstate or mischaracterize the content, substance or import of said documents, or cite to the same out of context or in a misleading fashion, they are denied

16.    Denied

17.    Denied.

18.    The allegations set forth in this paragraph of the Complaint attempt to characterize a document which, in its entirety, speaks for itself.  To the extent that said allegations misstate or mischaracterize the content, substance or import of said document, or cite to the same out of context or in a misleading fashion, they are denied.

19.    Denied.

20.    The allegations set forth in this paragraph of the Complaint attempt to characterize a document which, in its entirety, speaks for itself.  To the extent that said allegations misstate or mischaracterize the content, substance or import of said document, or cite to the same out of context or in a misleading fashion, they are denied.  Further answering, Scholz denies the allegations set forth in this paragraph of the Complaint.

21.    Scholz admits that, in or about January of 2013, he caused to be delivered to Ahern and certain affiliated entities a Notice of Termination.  The remaining allegations set forth in this paragraph of the Complaint attempt to characterize that document, which, in its entirety, speaks for itself.  To the extent that said allegations misstate or mischaracterize the content, substance or import of said document, or cite to the same out of context or in a misleading fashion, they are denied.

22.    The allegations set forth in this paragraph of the Complaint attempt to characterize a document which, in its entirety, speaks for itself.  To the extent that said allegations misstate or mischaracterize the content, substance or import of said document, or cite

4

to the same out of context or in a misleading fashion, they are denied.  Further answering, Scholz

avers that the notice referred to in this paragraph of the Complaint did have the legal effect of

terminating the prior grant of rights in certain musical compositions, as is more fully set forth in

said notice.

23.    The allegations set forth in this paragraph of the Complaint attempt to

characterize a document which, in its entirety, speaks for itself.  To the extent that said

allegations misstate or mischaracterize the content, substance or import of said document, or cite

to the same out of context or in a misleading fashion, they are denied.

24.    Scholz admits that the compositions identified in the Complaint as "First Album

Compositions" were written prior to December 31, 1977.  The remaining allegations set forth in

this paragraph of the Complaint attempt to characterize a document which, in its entirety, speaks

for itself.  To the extent that said allegations misstate or mischaracterize the content, substance or

import of said document, or cite to the same out of context or in a misleading fashion, they are

denied.

25.    Scholz admits that, by virtue of the 1978 Modification Agreement, operation of

law, and otherwise, so-called termination rights in respect of the First Album Compositions are

governed by Section 203 of the Copyright Act of 1976.  The remaining allegations set forth in

this paragraph of the Complaint state legal conclusions to which no response is required.

26.    Scholz admits that the grants of rights in the compositions identified in the

Complaint as "Second Album Compositions" are subject to termination under Section 203 of the

Copyright Act.

27.    The allegations set forth in this paragraph of the Complaint attempt to

characterize a document which, in its entirety, speaks for itself.  To the extent that said

5

allegations misstate or mischaracterize the content, substance or import of said document, or cite to the same out of context or in a misleading fashion, they are denied.

28.     The allegations set forth in this paragraph of the Complaint attempt to characterize a document which, in its entirety, speaks for itself.  To the extent that said allegations misstate or mischaracterize the content, substance or import of said document, or cite to the same out of context or in a misleading fashion, they are denied.  Further answering, Scholz denies that his so-called termination arguments were first raised in a November 2009 letter, as alleged in this paragraph of the Complaint.

29.     The allegations set forth in this paragraph of the Complaint attempt to characterize a document which, in its entirety, speaks for itself.  To the extent that said allegations misstate or mischaracterize the content, substance or import of said document, or cite to the same out of context or in a misleading fashion, they are denied.

30.     Scholz admits that his attorney had a telephone conversation with plaintiffs' attorney in which, *inter alia*, matters related to the termination of the grants of copyright in the First Album Compositions and Second Album Compositions were discussed, which conversation was subject to and is protected by, *inter alia*, Fed. R. Evid. 408.  Scholz denies the remaining allegations set forth in this paragraph of the Complaint.

31.     Scholz admits the allegations set forth in this paragraph of the Complaint for the reason, *inter alia*, that he is under no legal or other obligation to withdraw the notice referred to therein.

32.     Denied.

## NEITHER THE FIRST NOR THE SECOND ALBUM COMPOSITIONS QUALIFY FOR TERMINATION OF RIGHTS UNDER SECTION 203

33.    The allegations set forth in this paragraph of the Complaint attempt to characterize a document, *i.e.*, a section of the Copyright Act, which, in its entirety, speaks for itself. To the extent that said allegations misstate or mischaracterize the content, substance or import of said document, or cite to the same out of context or in a misleading fashion, they are denied.

34.    Denied.

35.    Denied.

36.    The allegations set forth in this paragraph of the Complaint attempt to characterize a document which, in its entirety, speaks for itself. To the extent that said allegations misstate or mischaracterize the content, substance or import of said document, or cite to the same out of context or in a misleading fashion, they are denied. Further answering, Scholz avers that the April 1978 Modification Agreement does constitute a new grant that superseded any grant of copyright conveyed by the 1975 Songwriter Agreement and that, as such, the provisions of Section 203 of the 1976 Copyright Act apply to the termination thereof.

37.    The allegations set forth in the first two sentences of this paragraph of the Complaint attempt to characterize documents which, in their entirety, speak for themselves. To the extent that said allegations misstate or mischaracterize the content, substance or import of said documents, or cite to the same out of context or in a misleading fashion, they are denied. Further answering, Scholz denies the specific factual allegations set forth in the first two sentences of said paragraph. The allegations set forth in the first phrase of the third sentence of this paragraph of the Complaint attempt to characterize a document which, in its entirety, speaks for itself. To the extent that said allegations misstate or mischaracterize the content, substance or

7

import of said document, or cite to the same out of context or in a misleading fashion, they are denied. Scholz admits the allegations set forth in the final phrase of the third sentence of this paragraph of the Complaint, *i.e.*, that the the 1975 Songwriter Agreement has not been held by a court of law to be void, voidable or terminated.

38.    The allegations set forth in the first sentence of this paragraph of the Complaint attempt to characterize a document which, in its entirety, speaks for itself.  To the extent that said allegations misstate or mischaracterize the content, substance or import of said document, or cite to the same out of context or in a misleading fashion, they are denied.  Further answering, Scholz avers that said allegations state legal conclusions to which no response is required, although, in so answering, Scholz denies the same.  Scholz denies the allegations set forth in the second sentence of this paragraph of the Complaint.

39.    The allegations set forth in this paragraph of the Complaint state legal conclusions to which no response is required, although, in so answering, Scholz denies the same.

40.    The allegations set forth in this paragraph of the Complaint state legal conclusions to which no response is required, although, in so answering, Scholz denies the same.

41.    The allegations set forth in this paragraph of the Complaint state legal conclusions to which no response is required, although, in so answering, Scholz denies the same.

42.    The allegations set forth in this paragraph of the Complaint state legal conclusions to which no response is required, although, in so answering, Scholz denies the same.

43.    The allegations set forth in this paragraph of the Complaint state legal conclusions to which no response is required, although, in so answering, Scholz denies the same.

44.    The allegations set forth in this paragraph of the Complaint attempt to characterize a document which, in its entirety, speaks for itself.  To the extent that said

allegations misstate or mischaracterize the content, substance or import of said document, or cite to the same out of context or in a misleading fashion, they are denied.  Further answering, Scholz avers that the allegations set forth in said paragraph state legal conclusions, to which no response is required, although, in so answering, Scholz denies the same.

45.    The allegations set forth in this paragraph of the Complaint state legal conclusions to which no response is required, although, in so answering, Scholz denies the same.

46.    The allegations set forth in this paragraph of the Complaint attempt to characterize a document which, in its entirety, speaks for itself.  To the extent that said allegations misstate or mischaracterize the content, substance or import of said document, or cite to the same out of context or in a misleading fashion, they are denied.  Further answering, Scholz avers that the allegations set forth in said paragraph state legal conclusions to which no response is required, although, in so answering, Scholz denies the same.

47.    The allegations set forth in this paragraph of the Complaint attempt to characterize a document which, in its entirety, speaks for itself.  To the extent that said allegations misstate or mischaracterize the content, substance or import of said document, or cite to the same out of context or in a misleading fashion, they are denied.

48.    The allegations set forth in this paragraph of the Complaint attempt to characterize certain documents which, in their entirety, speak for themselves.  To the extent that said allegations misstate or mischaracterize the content, substance or import of said documents, or cite to the same out of context or in a misleading fashion, they are denied.

49.    Denied.

50.    Denied.

51.      The allegations set forth in this paragraph of the Complaint state legal conclusions to which no response is required, although, in so answering, Scholz denies the same.

## CLAIM

52.      Scholz incorporates herein by reference, in their entirety, his answers to the preceding paragraphs of the Complaint, as stated above.

53.      The allegations set forth in this paragraph of the Complaint attempt to characterize plaintiffs' claims and requests for relief in this action, to which no response is required, although in so answering Scholz denies that plaintiffs are entitled to the declaratory and related relief that are described in said paragraph.

## DECLARATION

54.      The allegations set forth in this paragraph of the Complaint state legal conclusions to which no response is required.

55.      The allegations set forth in this paragraph of the Complaint state legal conclusions to which no response is required.  Further answering, Scholz avers that he is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in said paragraph.

56.      The allegations set forth in this paragraph of the Complaint state legal conclusions to which no response is required.

57.      The allegations set forth in this paragraph of the Complaint state legal conclusions to which no response is required.

58.      The allegations set forth in this paragraph of the Complaint state legal conclusions to which no response is required.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Plaintiffs' Complaint fails to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Venue is not proper in this judicial district as, *inter alia*, Scholz is a resident of the Commonwealth of Massachusetts and has no agent residing or who may be found in this district and, as such, this action properly should have been instituted in the District of Massachusetts pursuant to 28 U.S.C. § 1400(a).

### THIRD AFFIRMATIVE DEFENSE

Plaintiff Next Decade Entertainment, Inc. has no standing to assert the claims raised in plaintiffs' Complaint.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiff Ahern has no standing to assert the claims raised in plaintiffs' Complaint.

### FIFTH AFFIRMATIVE DEFENSE

As the copyright registrants for the musical compositions at issue in this action are Pure Songs, Scholz, or certain third-parties, but not Ahern, Ahern is not a real party-in-interest in this action.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the doctrine of "unclean hands."

### SEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, on the grounds that plaintiff acted in bad-faith.

11

**EIGHTH AFFIRMATIVE DEFENSE**

Scholz incorporates herein by reference as a defense to plaintiffs' claims the factual allegations set forth in his Counterclaims that follow, and the averments set forth in Count I thereof.

**NINTH AFFIRMATIVE DEFENSE**

Scholz reserves the right to assert additional affirmative defenses, including upon the discovery of new or previously unknown information.

**PRAYER FOR RELIEF**

WHEREFORE, based on the foregoing answers, averments and defenses, plaintiff Donald Thomas Scholz respectfully requests:

A.    That plaintiffs' Complaint, and all claims asserted therein, be dismissed with prejudice, or, in the alternative, that judgment thereon be entered in Scholz's favor.

B.    That this Court award Scholz the reasonable attorneys' fees, costs and expenses that he incurs in and in connection with this action, including, *inter alia*, pursuant to 17 U.S.C. § 505.

C.    That the Court grant Scholz such other and further relief as it may deem just and appropriate in the circumstances.

**JURY DEMAND**

Scholz hereby demands a trial by jury on all claims and issues raised by the Complaint that are so triable.

**COUNTERCLAIMS**

Defendant and plaintiff-in-counterclaim Donald Thomas Scholz ("Scholz"), through his undersigned counsel, hereby asserts the following Counterclaims against plaintiff Paul Ahern

12

("Ahern"), individually and doing business as "Pure Songs" (to the extent that Pure Songs is a sole proprietorship).

## INTRODUCTION

By and through these Counterclaims, Scholz, the founder of, and moving force behind the internationally-known musical group professionally known as "BOSTON," seeks declaratory relief and monetary damages against Ahern, who has parasitically exploited Scholz's professional and financial achievements for nearly four decades. Specifically, through these Counterclaims, Scholz seeks a judicial declaration that, pursuant to 17 U.S.C. § 203, he properly served notice of the termination of certain grants pursuant to which Ahern claims ownership of the copyrights in thirteen compositions that Scholz authored and which were embodied on BOSTON's first two albums. As a concomitant thereto, Scholz seeks damages for Ahern's breach of certain agreements that he entered into with Scholz, through Ahern's failure to pay certain public performance royalties to Scholz generated from Scholz's compositions, and Ahern's unauthorized licensing of certain sound recordings of BOSTON for use, *inter alia*, in a number of highly visible commercial advertising campaigns.

In further support of his Counterclaims as asserted herein, Scholz alleges and avers as follows:

## PARTIES

1.      Scholz is an individual residing in Middlesex County, Massachusetts.

2.      Ahern is an individual who, upon information and belief (based on the allegations set forth at paragraph 1 of plaintiffs' Complaint in this action), is a citizen of the State of Florida, residing at 100 Oakmont Lane, Apt. 702, Belleair, Florida. Upon information and belief, Ahern conducts certain of his music publishing activities under the name "Pure Songs."

## JURISDICTION AND VENUE

3.    This Court has subject-matter jurisdiction over these Counterclaims to the extent that it has subject-matter jurisdiction over the claims asserted in plaintiffs' Complaint in this action.

4.    This Court also has subject-matter jurisdiction over the claim asserted in Count I of these Counterclaims pursuant to 28 U.S.C. §§ 1331 and 1338, in that the Counterclaims arise under the laws of the United States, namely the Copyright Act, 17 U.S.C. § 101 *et seq.*

5.    This Court also has subject-matter jurisdiction over the claims asserted in Counts II and III of these Counterclaims pursuant to 28 U.S.C. § 1367(a).

6.    This Court also has subject-matter jurisdiction over the claims asserted in Counts II and III of these Counterclaims pursuant to 28 U.S.C. § 1332, in that said claims are between citizens of different States, *i.e.*, Scholz is a citizen of the Commonwealth of Massachusetts and Ahern is a citizen of the State of Florida, and the matter in controversy therein, exclusive of interest and costs, exceeds the sum or value of $75,000.

7.    This Court has personal jurisdiction over Ahern in that, *inter alia*, he purposefully availed himself of this forum by commencing the present action in this Court.

8.    Venue in respect of the within Counterclaims is proper in this judicial district to the extent that this district is the proper venue for the adjudication and resolution of the claims that plaintiffs have asserted in this action, although the same is without waiver of or prejudice to Scholz's averment, in his Answer to the Complaint, that venue in respect of plaintiffs' claims is not proper in this judicial district.

## FACTUAL BACKGROUND

9.      Scholz was born and raised in Toledo, Ohio, and has resided in the Boston, Massachusetts area since 1965.

10.     Scholz attended and obtained an engineering degree and a master of science degree from the Massachusetts Institute of Technology, and more than thirty patents have issued in his name or by reason of his inventions.

11.     Scholz is a classically trained musician, who plays a number of instruments, including guitar, bass guitar, piano and organ.  Scholz is an experienced recording and performing artist and, as well, an accomplished songwriter, record producer, arranger, recording engineer and studio owner/operator.

12.     In or about 1975, Scholz founded the musical act which became known as the group "BOSTON."  Scholz was and remains the leader of and the moving force behind the group, having founded it; composed the vast majority of the compositions the group has recorded over the years; produced and engineered each of the group's six albums; and otherwise conceptualized, developed and implemented his vision for the group's direction for nearly four decades.

13.     Scholz is the owner of certain incontestable and famous federal trademark registrations for the standard character mark "BOSTON" as the identifier of the group, and the design mark:



14.    For approximately forty years, Scholz has created, built and protected the valuable goodwill associated with his music, his compositions, his recordings, his performances and the activities of BOSTON.

15.    During the early 1970s, Scholz composed certain compositions and produced certain recordings of those compositions in the hope that he might obtain an agreement with a major record label for the release, sale and other exploitation of those recordings.

16.    During that time period, Scholz was introduced to Ahern by Ahern's then partner, Charles McKenzie. Ahern and McKenzie represented to Scholz that they had substantial experience in the music industry and that they would be able to guide Scholz in his professional activities and, as well, act as the publisher of his compositions and, in connection therewith, seek and obtain a recording agreement for him with a major record label.

17.    Ahern and McKenzie proposed to Scholz that they act in multiple capacities ostensibly on his behalf, *i.e.*, his personal manager, his publishing company and his record label, despite the fact that occupying those multiple roles would create, by virtual definition, a conflict of interest and internally inconsistent and conflicting duties on their part.

18.    At the time, Scholz was unschooled in the music business and was not represented by counsel knowledgeable in the entertainment industry - - although Ahern's attorney subsequently informed Scholz that he (Ahern's attorney) would act as Scholz's attorney.

19.    Based on the representations of Ahern and McKenzie, and in reliance thereon, and in the absence of disclosure by them of the virtually inevitable conflicts created by the multiple roles that they intended to occupy in respect of Scholz's career, in or about November of 1975, Scholz executed three separate, but interrelated and intertwined agreements with Ahern and McKenzie and/or certain entities acting on their behalf.

16

20.     In this regard, on (or as of) November 15, 1975, Scholz entered into an agreement

with "Charles McKenzie and Paul Ahern d/b/a P.C. Productions" (the "Management

Agreement"), pursuant to which Ahern and McKenzie assumed the role of Scholz's personal

manager. In the Management Agreement, Scholz engaged Ahern and McKenzie on an exclusive

basis to, *inter alia*, "supervise [Scholz'] professional employment" and render "such advice,

guidance, counsel and other services as [Scholz] may reasonably require to further [his] career as

a performing artist, musician, composer and writer." The Management Agreement obligated

Scholz to pay 20% of his "gross earnings" from the entertainment industry to Ahern and

McKenzie, both during and, in certain respects, after the expiration of the Management

Agreement's term. By virtue of the relationship created by the Management Agreement, Ahern

and McKenzie owed a fiduciary duty to Scholz.

21.     Ahern and McKenzie, as Scholz's fiduciaries, owed Scholz a duty to secure for

him the best possible agreements and arrangement in respect of his activities in the entertainment

industry, free from any self-interest, self-dealing or conflicts of interest on their part.

22.     Notwithstanding that fact, McKenzie and Ahern induced Scholz to enter into both

a publishing and a recording agreement with them (or certain entities acting on their behalf), in

derogation of their fiduciary duty to Scholz.

23.     As a result of the inducements of McKenzie and Ahern, on (or as of) November

15, 1975, Scholz entered into an agreement with P.C. Productions, *i.e.*, the alter-ego of Ahern

and McKenzie, in respect of Scholz's "services for us [*i.e.*, Ahern and McKenzie] as a recording

artist" (the "Recording Agreement"). The initial term of the Recording Agreement was through

May of 1976, and the Recording Agreement afforded Ahern and McKenzie four separate options

to extend the Recording Agreement, each for an additional one year period.

17

24.     The Recording Agreement contained meager royalty provisions; contemplated the payment of virtually no advance to Scholz; purported to grant Ahern and McKenzie rights in Scholz's merchandising activities; and was otherwise woefully inadequate and one-sided.

25.     The Recording Agreement provided that all recordings made by Scholz thereunder "shall be entirely our property," *i.e.*, the property of Ahern and McKenzie (acting as P.C. Productions), and purported to grant Ahern and McKenzie the perpetual worldwide right to use Scholz's name and likeness in connection with their business and products.

26.     The Recording Agreement also obligated Scholz to enter into a music publishing agreement with a designated affiliate of Ahern and McKenzie, pursuant to which that affiliate would be the publisher of Scholz's compositions.

27.     A personal manager, properly fulfilling his fiduciary duty to an artist he represented of Scholz's talent and ability, would not have permitted the artist to enter into an agreement containing the terms contained in the Recording Agreement.

28.     Having thus induced Scholz to enter into the Management Agreement and the Recording Agreement with them, Ahern and McKenzie then induced Scholz, also on (or as of) November 15, 1975, to enter into a "Songwriter's Agreement" with Ahern (the "Publishing Agreement"). Upon information and belief, although the Publishing Agreement ostensibly was with Ahern, through McKenzie's partnership with Ahern, McKenzie also had certain rights and interests in the Publishing Agreement.

29.     Pursuant to the Publishing Agreement, Scholz was engaged "as an exclusive songwriter" and sold to Ahern "all musical works . . . which have been prior to the date hereof, written composed, created or conceived in whole or in part by [Scholz], and which may

hereafter, during the term hereof, which shall be for a period of five (5) years from the date of this agreement, be written, composed, created or conceived by [Scholz] in whole or in part. . . ."

30.    The Publishing Agreement contains a number of unacceptable and substandard terms including, *inter alia*, terms governing the payment of royalties to Scholz.

31.    A personal manager, acting free of a conflict of interest and engaged in fair-dealing as a fiduciary, would not have permitted an artist he represented of Scholz's talent and ability to enter into a songwriting agreement containing the terms set forth in the Publishing Agreement.

32.    Through the foregoing collusive conduct, in breach of fiduciary duties and other obligations, Ahern and McKenzie usurped and hijacked virtually every material aspect of Scholz's career in the entertainment industry.

33.    In or about February of 1976, Ahern Associates, which, upon information and belief, was a d/b/a of Ahern in which McKenzie also possessed certain rights and interests, entered into a recording agreement with CBS Records ("CBS"), which was subsequently amended (as amended, the "CBS Agreement"). In the CBS Agreement, CBS was granted the right to release and exploit recordings by the group Scholz had founded, BOSTON, for sale and other commercial exploitation. At this time, the group's members were Scholz and Bradley Delp. Scholz subsequently engaged other musicians to perform with the group. The terms and provisions of the CBS Agreement are far more favorable to Ahern Associates than the terms of the Recording Agreement are to Scholz.

34.    The group's first album (the "First Album") was released in 1976 by Epic Records, a division of CBS, pursuant to the CBS Agreement.

19

35.    Scholz is the sole author of seven musical compositions on the First Album (the "First Album Compositions"), including the seminal work *More Than A Feeling*, and he is the co-author of an eighth composition on that album.

36.    Scholz secured copyright registrations for five of the seven First Album Compositions prior to his entry in November of 1975 into the Management, Recording and Publishing Agreements (collectively, the "1975 Agreements").

37.    Pure Songs subsequently recorded certain filings with the Copyright Office in respect of the First Album Compositions, and, after those documents were later revoked or cancelled, Scholz assigned the original copyright registrations in the First Album Compositions to Pure Songs through a document dated January 21, 1977, which was recorded with the Copyright Office on February 7, 1977.

38.    Renewal documents were filed on October 15, 2004 in the name of Pure Songs for unspecified registrations for *More Than a Feeling* and *Hitch a Ride*, but no other First Album Compositions. Renewals for *Peace of Mind* and *Foreplay* and *Long Time* were secured in the name of Scholz on January 2, 2002 and January 6, 2004, respectively.

39.    BOSTON's First Album was an unqualified critical and commercial success. The album sold more than 17 million units worldwide and, as of that time, was the most successful first album release by a new group in the history of the recording industry.

40.    Following the release of the First Album in 1976, Ahern and McKenzie breached one or more of the 1975 Agreements in a variety of material respects.

41.    As a result, and for other reasons, by 1978 Scholz desired to terminate his association with the Ahern/McKenzie partnership and, preferably, with both of its partners.

42.     Upon information and belief, at or about the same time, certain disputes had arisen between Ahern and McKenzie that interfered substantially both with their relationship and with Scholz's ability to complete the work he was then performing on BOSTON's contemplated second album.

43.     Rather than terminate altogether Scholz's relationship with the Ahern/McKenzie partnership, as Scholz had the right to do in light of their contractual breaches and other defalcations, the parties agreed to a new construct to govern their relationship.

44.     In this regard, in April of 1978, Ahern and McKenzie entered into an agreement pursuant to which they ended their partnership and affiliation, and Ahern acquired all of McKenzie's rights and interest in the personal management, recording and publishing activities of Scholz and BOSTON, including in and pursuant to the 1975 Agreement.

45.     Ahern advised Scholz that Ahern and McKenzie had reached an agreement to terminate their relationship, and Ahern encouraged and induced Scholz to sign a new agreement solely with Ahern (or his designee).

46.     Based on Ahern's inducements, on (or as of) April 24, 1978, Scholz (together with the other then members of the group BOSTON, *i.e.*, Bradley Delp, Barry Goudreau, Francis Sheehan and Sib Hashian), entered into a certain agreement with "P.C. Productions . . . and Paul Ahern" (the "1978 Agreement").

47.     The 1978 Agreement made specific reference to, and contains provisions affecting the Management Agreement, the Recording Agreement and the Publishing Agreement.

48.     Confirming Scholz's then existing right to terminate the 1975 Agreements, including the Publishing Agreement, the 1978 Agreement specifically recites that "With respect to the Songwriter [*i.e.*, Publishing] Agreement, Scholz . . . hereby ratif[ies] and confirm[s] the

validity of all of the terms and provisions of that agreement *and any past breaches thereof, if any, shall not form the basis of a claim that the Songwriter Agreement is void, voidable or terminated.*" (Emphasis added). Under New York law, ratification is the act of knowingly giving sanction or affirmance to an act which would otherwise be unauthorized and not binding, including a voidable contract.

49.    In addition to the foregoing recitation, the 1978 Agreement modified and amended the Publishing Agreement in several material respects as is set forth in more detail at paragraph 71, below; and, as is also further explicated below, constituted a new grant of rights in compositions that Scholz authored during the term of the Publishing Agreement.

50.    From in or about February through August of 1978, the group BOSTON, under the leadership and guidance of Scholz, recorded the group's second album, entitled *Don't Look Back* (the "Second Album"). The Second Album contains six recorded compositions, all of which were solely authored by Scholz (the "Second Album Compositions").

51.    The Second Album was released for sale and commercial exploitation by Epic in or about August of 1978.

52.    Copyright registrations in the Second Album Compositions originally issued on August 10, 1978, with those works identified therein as unpublished.

53.    Following the release of the Second Album, registrations were secured for the copyrights in each of the Second Album Compositions on September 1, 1978. Those registrations averred that the Second Album Compositions were first published on August 18, 1978 and list Scholz as the sole author of all of the Second Album Compositions.

54.    BOSTON's Second Album was a significant critical and commercial success, selling in excess of seven million units worldwide.

55.    Following the release of BOSTON's Second Album, disputes and controversies continued to infect Scholz's relationship with Ahern.

56.    As a result, on (or as of) May 9, 1981, Scholz entered into an agreement with "P.C. Productions, d/b/a P.C. Productions, d/b/a Pure Songs and d/b/a Pure Management and Paul Ahern, individually and d/b/a Ahern Associates, d/b/a Pure Songs and d/b/a Pure Management, Ahern Associates and Left Lane, Inc. (the "1981 Agreement") that addressed certain, but not all, of the issues that were then in dispute between the parties.

57.    In the 1981 Agreement, the parties significantly and further amended the material terms of the Publishing Agreement, including in respect of royalties and other payments to be made thereunder.  The 1981 Agreement also further modified the Recording Agreement in a number of material respects.

58.    Following the execution of the 1981 Agreement, Scholz's deteriorating relationship with Ahern continued to be plagued by controversy and dispute.

59.    By in or about 1980, Ahern was no longer contractually entitled to and was not acting as Scholz's personal manager and, except for those rights that may have continued to exist pursuant to Ahern's prior agreements with Scholz and the group, Ahern had no further right to participate in the activities of Scholz or BOSTON.  Nonetheless, Ahern continued pursuing conduct in derogation of Scholz's rights and interests.

60.    Since 1981, the group BOSTON, under Scholz's continued leadership and guidance, has released four additional albums and, through the present date, continues to record and tour.

## COUNT I
### (Declaratory Judgment)

61.    Scholz hereby incorporates by reference, in their entirety, the allegations set forth in the preceding paragraphs of these Counterclaims.

62.    Pursuant to 17 U.S.C. § 304, "In the case of any copyright subsisting in either its first or renewal term on January 1, 1978 . . . the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978 . . ." is subject to termination "at any time during a period of five years beginning at the end of fifty-six years from the date copyright was originally secured, or beginning on January 1, 1978, whichever is later."

63.    In contrast, pursuant to 17 U.S.C. § 203, "In the case of any work . . . the exclusive or nonexclusive grant of a transfer or license of copyright or of any right under a copyright, executed by the author on or after January 1, 1978 . . ." is subject to termination "at any time during a period of five years beginning at the end of thirty-five years from the date of execution of the grant."

64.    In clarification of the foregoing, pursuant to a Final Rule issued by the Copyright Office on June 6, 2011: "In any case where an author agreed, prior to January 1, 1978, to a grant of a transfer or license of rights in a work that was not created until on or after January 1, 1978, a notice of termination of a grant under Section 203 of title 17 may be recorded if it recites, as the date of execution, the date on which the work was created." 37 C.F.R. 201.10(f)(5). In other words, where a work is created after January 1, 1978 under a grant entered into prior to that date, the grant in that work is nonetheless subject to termination under Section 203. Such works are referred to in copyright parlance, and herein, as "Gap Works."

65.     In or about January of 2013, Scholz, through his counsel, served a "Notice of

Termination" on Ahern and in care of certain affiliated entities (the "Notice") pursuant to which

Scholz provided "notice of his termination of any and all rights transferred to any or all of P.C.

Productions, Ahern Associates, Paul Ahern d/b/a Pure Songs, and Paul Ahern . . . in and to the

copyright in the musical works identified on the attached schedule of works," *i.e.*, the First

Album Compositions and the Second Album Compositions.  A copy of the Notice is attached

hereto and incorporated herein as Exhibit A.

66.     In the Notice, Scholz averred that, insofar as it pertained to his compositional and

publishing activities, the 1978 Agreement (which was executed *after* January 1, 1978)

constituted a new grant of grants in and to the First and Second Album Compositions, and was

thus subject to termination pursuant to Section 203 of the Copyright Act.

67.     In addition, and in the alternative to the foregoing, in the Notice, Scholz averred

that, as the Second Album Compositions were not written and recorded until after January 1,

1978, they constitute Gap Works, and that, as such, even if the 1978 Agreement is not construed

as constituting a new grant of rights, the grant of rights to Ahern pursuant to the 1975 Publishing

Agreement in Second Album Compositions is nonetheless subject to termination pursuant to

Section 203.

68.     Ahern responded to the Notice by, *inter alia*, filing the present action, in which

plaintiffs seek a judicial declaration that both the First Album Compositions and the Second

Album Compositions are subject to termination pursuant to Section 304, *i.e.*, fifty-six years after

copyright was first secured therein or after January 1, 1978, whichever is later, rather than

pursuant to Section 203, *i.e.*, thirty-five years after the grant of rights therein.

69.    Plaintiffs' aforesaid position as asserted in their Complaint is without merit and should be rejected by this Court.

70.    As alleged earlier herein, at the time that Scholz executed the 1978 Agreement, grounds existed to void and terminate all of the 1975 Agreements, including the Publishing Agreement.  Rather than enter into a formal termination of the Publishing Agreement and, then, an entirely new publishing agreement - - which plainly would have constituted a new grant of rights - - Scholz and Ahern decided instead to use the expedient of the 1978 Agreement to accomplish that end.  As such, the 1978 Agreement specifically confirms that Scholz will not seek to void or terminate the Publishing Agreement based on past breaches; "ratifies" the Publishing Agreement, *i.e.*, confirms that it was unauthorized and voidable but nonetheless affirms it; and, at the same time, materially modifies and amends certain provisions of the Publishing Agreement.

71.    In this regard, pursuant to the 1978 Agreement:

A.    The rights granted in the Publishing Agreement were transferred to a different party, *i.e.*, to P.C. Productions and Ahern, such that the "publisher" of Scholz's compositions now was a sole proprietorship owned and controlled solely by Ahern, rather than the partnership of which McKenzie had been a member.

B.    (As provided in a certain amendment to the CBS Agreement, endorsed by, *inter alia*, Scholz, that is specifically referenced in the 1978 Agreement) the publishing income due to Scholz, the author of the vast majority of the compositions on the First and the Second BOSTON Albums, was subject for the first time to retroactive and prospective recoupment by CBS for recording advances and other expenses, which ultimately benefitted the other then members of BOSTON who shared recording (but not publishing) royalties equally.

26

C.    Ahern and his affiliated entities were granted, for the first time, a no-fee license to use the service mark "BOSTON" in connection with their rights pursuant to the 1975 Agreement, which mark was solely owned by Scholz.

D.    Pure Songs was identified for the first time as Ahern's publishing designee.

E.    McKenzie, "from this date forward shall have no right, title or interest, ownership or otherwise, in P.C., Ahern Associates and Ahern d/b/a Pure Songs . . . ."

F.    Other members of the group BOSTON, *i.e.*, Goudreau, Sheehan and Hashian, who were not parties to the 1975 Agreements, were added as parties and signatories to the 1978 Agreement.

G.    In the event of inconsistencies or ambiguities between the 1978 Agreement and the Publishing Agreement, the 1978 Agreement governs.

72.    At the time Ahern entered into the 1978 Agreement with Scholz, Ahern intended and acknowledged that the 1978 Agreement constituted a new grant of rights in the First and (contemplated) Second Album Compositions and that, as such, termination rights in respect of those Compositions would be governed by Section 203, rather than Section 304, of the Copyright Act.  In that regard, contemporaneously with the negotiation and execution of the 1978 Agreement, Ahern and Ahern's counsel separately advised Scholz that, due to the provisions of the then new Copyright Act, by entering into the 1978 Agreement, Ahern and his affiliated entities were giving up their right to benefit from a fifty-six year copyright termination period, and substituting the same with a thirty-five year termination period.  In this regard, Ahern specifically advised Scholz that "I am giving up fifty-six years for thirty-five years, but in thirty-five years who's going to care about BOSTON anyway?"

73.    By and through the foregoing and similar statements, Ahern, individually and through his counsel, confirmed both his clear understanding as to the import of the 1978 Agreement and the contracting parties' intent with respect thereto, *i.e.*, the conferring of a new grant of rights in the First and Second Album Compositions.

74.    As the 1978 Agreement was executed after January 1, 1978, and, as alleged above, constituted a new grant of rights in the First Album and Second Album Compositions, Scholz's termination rights in respect of those Compositions are governed by Section 203.

75.    As such, and contrary to plaintiffs' allegations in their Complaint, the Notice reflects a valid exercise of Scholz's termination rights pursuant to Section 203.

76.    An additional, independent basis exists for the application of Section 203 to the termination of Scholz's grant of rights to Ahern in the Second Album Compositions.

77.    As alleged earlier herein, the Copyright Office has confirmed that, with respect to Gap Works, *i.e.*, compositions that were created after January 1, 1978, albeit pursuant to an agreement executed prior to January 1, 1978, the termination rights in respect of such compositions are governed by Section 203.

78.    In explaining this conclusion, the Copyright Office has noted that "as a matter of copyright law, a transfer that predates the existence of the copyrighted work cannot be effective (and therefore cannot be 'executed') until the work of authorship (and the copyright) come into existence." 76 F.R. 32316 (June 6, 2011).

79.    The Second Album Compositions were completed and fixed in 1978 and, as such, those works and the copyrights therein came into existence in 1978.

80.     Confirmatory of the foregoing, copyright registrations for the Second Album Compositions were first issued as unpublished works on August 10, 1978 and then as published works on September 1, 1978.

81.     Based on the allegations set forth in plaintiffs' Complaint and those set forth in these Counterclaims, a justiciable and actual controversy exists between Scholz and Ahern with respect to the validity and efficacy of the Notice, including whether Section 203 (as Scholz alleges) or Section 304 (as plaintiffs allege) governs the termination of Scholz's grants of rights in the First Album Compositions and the Second Album Compositions.

82.     As a result, and based on the foregoing allegations and averments, Scholz requests, pursuant to 28 U.S.C. § 2201, that this Court enter a judicial declaration that the 1978 Agreement reflected a new grant of a transfer or license of copyright or of a right under copyright executed after January 1, 1978 and that, as such, termination rights in the First Album Compositions and Second Album Compositions are governed by Section 203 of the Copyright Act.

83.     In addition and as an alternative to the foregoing, Scholz requests, pursuant to 28 U.S.C. § 2201, that this Court enter a judicial declaration that, even assuming that the 1978 Agreement was not a new grant, and that Ahern's rights in the Second Album Compositions were solely granted by the 1975 Publishing Agreement, those Compositions were completed and fixed in 1978, are Gap Works, and, as such, the grant of a transfer or license of copyright or a right under copyright in those Compositions occurred after January 1, 1978 and that the termination rights in respect of the Second Album Compositions are thus governed by Section 203 of the Copyright Act.

## COUNT II
### (Breach of Contract - - Recording Agreement)

84.     Scholz hereby incorporates by reference, in their entirety, the allegations set forth in the preceding paragraphs of these Counterclaims.

85.     Paragraph 15 of the Recording Agreement provides that "Notwithstanding any provision in this contract to the contrary, it is specifically understood and agreed as follows:

> (a)     You [Scholz] and we [P.C. Productions] are bound by all the terms and provisions of the AFTRA Code of Fair Practice for Phonograph Recordings.

> (b)     Should there be any inconsistency between this contract and said Code, said Code shall prevail . . . ."

86.     The AFTRA Code provides, in pertinent part, that "no part of any phonograph record, tape or other audio recording, or of any other production of a principal performer made under the jurisdiction of AFTRA . . . shall be used in commercials without separately bargaining with the principal performer and reaching an agreement regarding such use prior to any utilization of such . . . sound track under this Contract."

87.     Scholz is a principal performer on all recordings embodied on the First and Second Albums, with the sole exception of *Let Me Take You Home*, on which Scholz was a support performer.

88.     The First Album Composition *Peace of Mind* is a signature song written solely by Scholz, which is instantly recognizable by the general public as a work created and performed by Scholz and his group, BOSTON.

89.     Scholz was approached by Sony with a request to license *Peace of Mind* for a television advertising campaign for Panasonic computers.  Scholz refused to approve the

requested license.  Nonetheless, upon information and belief, Ahern, Pure Songs or a related or affiliated entity controlled by Ahern, purported to grant a license and authorization for the use of *Peace of Mind* in a Panasonic commercial for computer products, which appeared on Panasonic's website.

90.     The First Album Composition *More Than A Feeling* is a signature song written solely by Scholz, which is instantly recognizable by the general public as a work created and performed by Scholz and his group, BOSTON.

91.     On numerous and diverse occasions, Ahern, Pure Songs or a related or affiliated entity controlled by Ahern, without seeking or obtaining Scholz's consent, purported to grant licenses or other authorization for the use of *More Than A Feeling* in a number of television commercials, including for Nestle Iced Tea, the Pechanga Resort & Casino, the New York Lottery and Boston Pizza.

92.     In addition to the foregoing, Ahern, Pure Songs or a related or affiliated entity controlled by Ahern, without seeking or obtaining Scholz's consent, granted a license or other authorization for the use of *More Than A Feeling* in the movie *The Men Who Stare At Goats* and in advertising trailers for that film.

93.     Had Scholz's approval or consent been requested under the Recording Agreement and as contemplated by the AFTRA Code for the aforesaid uses of such recordings, he would have refused to grant the same.

94.     The aforesaid unauthorized use of the *Peace of Mind* and *More Than A Feeling* recordings for advertising purposes has resulted in confusion among the public as to Scholz's affiliation with and endorsement of the products (and film) that were advertised through such uses of those recordings, and misled the public into believing that Scholz consented to and

approved the use of his recordings and compositions for those purposes and that he thus endorsed those products (and film).

95.    Ahern, Pure Songs and their related and affiliated entities failed to comply with the requirements of the AFTRA Code in respect of the foregoing uses of the aforesaid recordings.

96.    The aforesaid failure constitutes a breach of the Recording Agreement.

97.    Scholz had been damaged as a result of the aforesaid contractual breach in an amount to be determined at trial.

**COUNT III**
**(Breach of Contract - - 1981 Agreement)**

98.    Scholz hereby incorporates by reference, in their entirety, the allegations set forth in the preceding paragraphs of these Counterclaims.

99.    Pursuant to the 1981 Agreement, Ahern and Pure Songs were required to pay Scholz fifty percent of the so-called publisher's share of performance royalties generated from the Second Album Compositions.  Said Royalties are collected, in the first instance, by ASCAP.

100.    Upon information and belief, Ahern and Pure Songs failed to notify ASCAP of the requirement in the 1981 Agreement that Scholz receive fifty percent of the publisher's share of ASCAP performance royalties from the Second Album Compositions.

101.    As a result, ASCAP continued to pay Pure Songs and/or Ahern 100% of the publisher's share of performance royalties in respect of the Second Album Compositions.

102.    In or about 2009, Scholz discovered the failure of Ahern and Pure Songs to pay him his allocable share of the publisher's share of ASCAP performance royalties pursuant to the 1981 Agreement, for the period of time beginning at least as early as 1998.

103.    Specifically, Pure Songs and Ahern failed to pay Scholz at least $166,000 (excluding interest) of his allocable share of the publisher's share of ASCAP performance royalties, in derogation of the 1981 Agreement.

104.    Following Scholz's discovery of this underpayment, in 2009, Scholz and Ahern, through their respective representatives, negotiated and reached an agreement in principle as to the material terms of the settlement and resolution of the parties' dispute regarding the payment of the publisher's share of ASCAP performance royalties (the "2009 Agreement").

105.    Pursuant to the 2009 Agreement, Ahern and Pure Songs agreed to pay all amounts due to Scholz pursuant to the 1981 Agreement for his allocable share of the publisher's share of ASCAP performance royalties for the Second Album Compositions, commencing with the period beginning in 1998 and continuing thereafter to the present.

106.    Shortly after the parties reached the 2009 Agreement, but before the written contract memorializing that Agreement was signed, Scholz advised Ahern of his intent to exercise his termination rights pursuant to Section 203 of the Copyright Act.

107.    As a result of the foregoing, and as a punitive measure intended to deter Scholz from exercising his rights under the Copyright Act, Ahern and Pure Songs refused to execute the written memorialization of the 2009 Agreement and failed to comply with the terms of the 2009 Agreement.

108.    Specifically, Ahern and Pure Songs paid Scholz only amounts due under the 1981 Agreement for Scholz's allocable share of the publisher's share of ASCAP performance royalties for the Second Album Compositions from on or about October 1, 2003 forward, and refused to pay the amounts due to Scholz for any earlier dates.

109.    The aforesaid conduct of Ahern and Pure Songs constitutes a breach of the 1981 Agreement.

110.    The aforesaid conduct of Ahern and Pure Songs constitutes a breach of the 2009 Agreement.

111.    The claim asserted in this Count III arises from the transactions, occurrences, and/or a series of transactions and occurrences upon which plaintiffs' claim, as asserted in their Complaint, depends.

112.    Scholz has been damaged by reason of the aforesaid breaches in an amount to be determined at trial.

## PRAYERS FOR RELIEF

WHEREFORE, based on the foregoing allegations and averments, defendant and plaintiff-in-counterclaim Donald Thomas Scholz prays that this Court enter the following relief:

A.    That, on Count I of his Counterclaims, the Court (i) enter a judicial declaration that the 1978 Agreement reflected a new grant of a transfer or license of copyright or of a right under copyright executed after January 1, 1978 and that, as such, termination rights in the First Album Compositions and Second Album Compositions are governed by Section 203 of the Copyright Act; (ii) in addition and as an alternative to the foregoing, enter a judicial declaration that, even assuming that the 1978 Agreement was not a new grant, and that Scholz's sole grant of rights to Ahern in the Second Album Compositions was pursuant to the 1975 Publishing Agreement, those Compositions were completed and fixed in 1978, are Gap Works, and, as such, the grant of a transfer or license of copyright or a right under copyright in those Compositions occurred after January 1, 1978 and that the termination rights in respect of the Second Album Compositions are thus governed by Section 203 of the Copyright Act; and (iii) as a concomitant

thereto, award Scholz his reasonable attorneys' fees, costs and expenses incurred as the prevailing party under 17 U.S.C. § 505.

      B.      That this Court enter judgment in Scholz's favor and against Ahern/Pure Songs on Count II of this Counterclaim in an amount to be determined at trial, together with interest thereon as provided by law and, as a concomitant thereto, award to Scholz the attorneys' fees he incurs in connection with that claim.

      C.      That this Court enter judgment in Scholz's favor and against Ahern/Pure Songs on Count III of this Counterclaim in an amount to be determined at trial, together with interest thereon as provided by law and, as a concomitant thereto, award to Scholz the attorneys' fees he incurs in connection with that claim.

      D.      That this Court grant Scholz such other and further relief as it may deem just and appropriate in the circumstances.

### JURY DEMAND

      Scholz hereby demands a trial by jury on all matters so triable asserted in his Counterclaims.

                  Respectfully submitted,

                  **ROSENBERG & GIGER P.C.**

                  By: _____
                  John J. Rosenberg
                  Brett T. Perala
                  488 Madison Avenue, 10th Floor
                  New York, NY 10022

                  *Attorneys for defendant and plaintiff-in-counterclaim Donald Thomas Scholz*

# EXHIBIT A

<u>NOTICE OF TERMINATION</u>

　　　　PLEASE TAKE NOTICE that, pursuant to Section 203 of the Copyright Act, the undersigned, Donald Thomas Scholz ("Scholz"), hereby provides notice of his termination of any and all rights transferred to any or all of P.C. Productions, Ahern Associates, Paul Ahern d/b/a Pure Songs, and Paul Ahern (collectively, "Pure Songs"), in and to the copyright in the musical works identified on the attached schedule of works (the "Schedule").

　　　　In connection with this Notice, Scholz offers the following information, required under 37 C.F.R. 201.10:

This termination is made under Section 203 of the Copyright Act.

The grantees whose rights are being terminated are Paul Ahern and P.C. Productions.  Upon information and belief, and after reasonable investigation, Paul Ahern and P.C. Productions are now doing business as Pure Songs.  This notice is being served upon the following, as listed in the ASCAP directory as of January 8, 2013, by First-Class Mail:

Pure Songs       Pure Songs
c/o BSFS Ltd       c/o Next Decade Entertainment Inc.
15360 China Rapids Drive   c/o Next Decade Music
Red Bluff, CA  96080    Attn:  Stuart Cantor
           65 West 55th Street, Suite 4F
           New York, NY  10019

    With a courtesy copy to:  Eisenberg Tanchum & Levy
           Attn: Stewart L. Levy
           675 Third Avenue
           New York, NY  10017

The date of execution of the grant which is being terminated is April 24, 1978.  Scholz and Paul Ahern signed a songwriter's agreement on November 15, 1975 (the "1975 Agreement"), which contains the grant language.  The 1975 Agreement is referenced in the recording, management and songwriting agreement executed by Scholz and other artists, and by P.C. Productions, Ahern Associates, Paul Ahern d/b/a Pure Songs, and Paul Ahern on April 24, 1978 (the "1978 Agreement").    A settlement between Paul Ahern and Charles McKenzie was executed contemporaneously with the 1978 Agreement (the "Settlement").  Prior to the 1978 Agreement and the Settlement, Scholz took the position that the 1975 Agreement was void, voidable, or terminated. He relinquished that position in exchange for various changes in the 1978 Agreement and revisions to a 1976 recording agreement with CBS Records. The 1978 Agreement changed the 1975 Agreement in many respects. One concerned the "Publisher." According to the Settlement, the 1975 Agreement was claimed to have been executed by Paul Ahern as a partner in a partnership between him and Charles McKenzie.  The Ahern/McKenzie partnership was dissolved by the Settlement.  Unlike the 1975 Agreement with Paul Ahern as a partner, the 1978 Agreement is with Paul Ahern as an individual and the only owner of P.C. Productions, Ahern Associates, and Paul Ahern d/b/a Pure Songs, and therefore constitutes a new grant of rights.

1

This Notice terminates all rights granted by Scholz to Pure Songs in the 1978 Agreement in and to the musical works identified on the attached Schedule.[1]

With respect to the works appearing on Boston's *Don't Look Back* album, an alternative basis for this notice under Section 203 of the Copyright Act is pursuant to the June 6, 2011 amendments to the regulations governing notices of termination: "In any case where an author agreed, prior to January 1, 1978, to a grant of a transfer or license of rights in a work that was not created until on or after January 1, 1978, a notice of termination of a grant under section 203 of title 17 may be recorded if it recites, as the date of execution, the date on which the work was created." 37 C.F.R. 201.10(f)(5). All works included on *Don't Look Back* were created in 1978.

To ensure the accuracy of information included in this Notice, Scholz requested copies of copyright registration certificates and relevant agreements from Pure Songs. Pure Songs failed to produce any documentation. As such, the information included above is culled from searches of the Copyright Office online records, commercial search reports, discovery documents and litigation exhibits, and ASCAP and other online databases.

The effective date of termination shall be January 24, 2015.

---

[1] This Notice of Termination applies to each and every work composed solely by Scholz that is included on Boston's debut album, *Boston*, and Boston's second album, *Don't Look Back*. If any such work has been omitted, such omission is unintentional and involuntary. Scholz reserves his rights to serve and record additional Notices of Termination in relation to works not deemed covered by this Notice of Termination.

To the best knowledge and belief of the undersigned, this Notice has been signed by the only person whose signature is necessary to terminate the grant referred to herein under Section 203 of the Copyright Act.

Dated: _/ · / 8 · / 3_____     Signed: _____

Donald Thomas Scholz
c/o Craig E. Pinkus
BOSE MCKINNEY & EVANS LLP
111 Monument Circle, Suite 2700
Indianapolis, IN 46204
Telephone: (317) 684-5358
Facsimile: (317) 684-0358

## Schedule of Works

*Boston*

| Title | Registration Number | Registration Date | Claimant | Date of Publication | Authorship listed on Registration |
|-------|---------------------|-------------------|----------|---------------------|-----------------------------------|
| More Than a Feeling | EU625326 | 10/29/75 | Donald T. Scholz[2]* | N/A | Musical composition, words, music and arrangement by Donald T. Scholz |
| More Than a Feeling | EU706122** | 8/9/76 | Pure Songs | N/A | Musical composition, words and music by Donald T. Scholz |
| More Than a Feeling | EP368076[3] | 11/4/76 | Donald T. Scholz | 11/4/76 | Musical composition, words and music by Donald T. Scholz; arrangement for piano by Columbia Pictures Publications as employer for hire of Bert Dovo |
| Peace of Mind | EU536104 | 11/19/74 | Donald T. Scholz[4]* | N/A | By Donald T. Scholz |
| Peace of Mind | EU706121** | 8/9/76 | Pure Songs | N/A | Words and music by Donald T. Scholz |
| Peace of Mind | EP366503[5] | 1/14/77 | Donald T. Scholz | 1/14/77 | Words and music by Donald T. Scholz; arrangement for piano by Columbia Pictures Publications as employer for hire of Bert Dovo |
| Peace of Mind | PA10590[6] | 4/25/78 | Donald T. Scholz | 4/5/78 | Words, music and arrangement by Donald T. Scholz |
| Fore-Play - Long Time | EU706125 | 8/9/76 | Pure Songs[7] | N/A | Words and music by Donald T. Scholz |

[2] The in-process records of the Copyright Office indicate that an application to renew this registration was received October 15, 2004, listing the author/claimant as Pure Songs.
[3] This registration cites the prior 1975 registration (EU625326).
[4] This registration was renewed on January 2, 2002 in the name of Donald T. Scholz (RE858058).
[5] This registration cites the prior 1974 registration (EU536104).
[6] This registration cites the prior 1977 registration (EP366503).
[7] This registration was renewed on January 6, 2004 in the name of Donald T. Scholz (RE895693).

| Title | Registration Number | Registration Date | Claimant | Date of Publication | Authorship listed on Registration |
|---|---|---|---|---|---|
| Foreplay | EP366502[8] | 1/14/77 | Pure Songs | 1/14/77 | Words and music by Donald T. Scholz; arrangement for piano by Columbia Pictures Publications as employer for hire of Bert Dovo |
| Song without Words | EU495558 | 6/17/74 | Donald T. Scholz* | N/A | Words, music, arrangement by Donald T. Scholz |
| Rock n' Roll Band | EU543181[9] | 12/23/74 | Donald T. Scholz* | N/A | Words, music and arrangement by Donald T. Scholz |
| Rock and Roll Band | EU706120** | 8/9/76 | Pure Songs | N/A | Words and music by Donald T. Scholz |
| Rock & Roll Band | EP366505[10] | 1/14/77 | Donald T. Scholz | 1/14/77 | Words and music by Donald T. Scholz; arrangement for piano by Columbia Pictures Publications as employer for hire of Bert Dovo |
| Gonna Hitch a Ride | EU226302 | 12/28/70 | Donald T. Scholz* | N/A | Donald T. Scholz, contribution not specified |
| Hitch a Ride | EU706124** | 8/9/76 | Pure Songs[11] | N/A | Words and music by Donald T. Scholz |
| Hitch a Ride | EP366507[12] | 1/14/77 | Donald T. Scholz | 1/14/77 | Words and music by Donald T. Scholz; arrangement for piano by Columbia Pictures Publications as employer for hire of Bert Dovo |
| It Isn't Easy | EU625325 | 10/29/75 | Donald T. Scholz* | N/A | Words, music and arrangement by Donald T. Scholz |

---

[8] This registration cites the prior 1976 registration (EU706125).
[9] This registration cites the prior June 17, 1974 registration (EU495558).
[10] This registration cites the prior December 23, 1974 registration (EU543181).
[11] The in-process records of the Copyright Office indicate that an application to renew this registration was received October 15, 2004, listing the author/claimant as Pure Songs.
[12] This registration cites the prior 1970 registration (EU226302).

| Title | Registration Number | Registration Date | Claimant | Date of Publication | Authorship listed on Registration |
|-------|--------------------|--------------------|----------|---------------------|------------------------------------|
| Something About You | EU706118** | 8/9/76 | Pure Songs | N/A | Words and music by Donald T. Scholz |
| Something About You | EP366508[13] | 1/14/77 | Donald T. Scholz | 1/14/77 | Words and music by Donald T. Scholz; arrangement for piano by Columbia Pictures Publications as employer for hire of Bert Dovo |

\* An Assignment of Copyright, dated January 21, 1977 and recorded February 7, 1977, shows assignment of these registrations from Donald T. Scholz to Pure Songs.

\*\* A letter from Blackwood Music, Inc., dated February 7, 1977 and recorded March 3, 1977, indicated that these registrations were "made erroneously... and should be expunged from the records of the Copyright Office." The five (5) registrations listed in the letter "duplicate pre-existing registrations made in the name of Donald T. Scholz for the subject musical compositions."

---

[13] This registration cites the prior 1975 registration (EU625325).

*Don't Look Back*

| Title | Registration Number | Registration Date | Claimant | Date of Publication | Authorship listed on Registration |
|---|---|---|---|---|---|
| Don't Look Back | PAu000052500 | 8/10/78 | Pure Songs | N/A | words & music: Tom Scholz |
| Don't Look Back | PA0000014789 | 9/1/78 | Pure Songs | 8/18/78 | words & music: Tom Scholz |
| The Journey | PAu000052494 | 8/10/78 | Pure Songs | N/A | music: Tom Scholz |
| The Journey | PA0000014790 | 9/1/78 | Pure Songs | 8/18/78 | music: Tom Scholz |
| It's Easy | PAu000052498 | 8/10/78 | Pure Songs | N/A | words & music: Tom Scholz |
| It's Easy | PA0000014791 | 9/1/78 | Pure Songs | 8/18/78 | words & music: Tom Scholz |
| A Man I'll Never Be | PAu000052497 | 8/10/78 | Pure Songs | N/A | words & music: Tom Scholz |
| A Man I'll Never Be | PA0000014792 | 9/1/78 | Pure Songs | 8/18/78 | words & music: Tom Scholz |
| Feelin' Satisfied | PAu000052499 | 8/10/78 | Pure Songs | N/A | words & music: Tom Scholz |
| Feelin' Satisfied | PA0000014793 | 9/1/78 | Pure Songs | 8/18/78 | words & music: Tom Scholz |
| Don't Be Afraid | PAu000052495 | 8/10/78 | Pure Songs | N/A | words & music: Tom Scholz |
| Don't Be Afraid | PA0000014796 | 9/1/78 | Pure Songs | 8/18/78 | words & music: Tom Scholz |

## Certificate of Service

The undersigned hereby certifies that he served by First-Class Mail, a true and correct copy of the foregoing Notice of Termination upon the following on this 23rd day of January, 2013:

Pure Songs
c/o BSFS Ltd
15360 China Rapids Drive
Red Bluff, CA  96080

Pure Songs
c/o Next Decade Entertainment Inc.
c/o Next Decade Music
Attn:  Stuart Cantor
65 West 55th Street, Suite 4F
New York, NY  10019

With a courtesy copy to:

Eisenberg Tanchum & Levy
Attn: Stewart L. Levy
675 Third Avenue
New York, NY  10017

_Craig E. Pinkus /dmd_

Craig E. Pinkus
BOSE MCKINNEY & EVANS LLP
111 Monument Circle, Suite 2700
Indianapolis, IN 46204
Telephone:  (317) 684-5358
Facsimile:  (317) 223-0358

8

## CERTIFICATE OF SERVICE

I certify that on the 21st day of May, 2013, a copy of the foregoing was filed

electronically.  Notice of this filing will be sent to the following counsel by operation of the

Court's electronic filing system:

> Stewart L. Levy
> Eisenberg Tanchum & Levy
> 675 Third Ave., Suite 2900
> New York, NY  10017
> Telephone:  (212) 599-0777
> E-mail:  SLevy@etllaw.com

_____
Brett T. Perala